## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

LISA CERVALLI,

    Plaintiff,

       v.

PIEDMONT HEALTHCARE, INC. and
PIEDMONT HENRY HOSPITAL,
INC.,

    Defendants.

Civil Action No. _____

JURY TRIAL DEMANDED

## **COMPLAINT**

Plaintiff Lisa Cervalli, by and through undersigned counsel, brings this retaliation Complaint against Defendants Piedmont Healthcare, Inc. and Piedmont Henry Hospital, Inc. (collectively, "Piedmont" or "the Defendants"). This action is brought by Plaintiff for relief from retaliatory actions under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and the Georgia False Medicaid Claims Act, O.C.G.A. §49-4-168.4.

1

## INTRODUCTION

1.      This is an action for relief from retaliatory actions by Piedmont against Plaintiff for lawful acts by employee to stop Piedmont from committing violations of the False Claims Act and Georgia False Medicaid Claims Act.

2.      Plaintiff attempted to stop Defendants from submitting and/or causing the submission of false claims by knowingly submitting reimbursement claims to Medicare, 42 U.S.C. § 1395 *et seq.*, Medicaid, 42 U.S.C. § 1396 *et seq.*, TRICARE/CHAMPUS 10 U.S.C. § 1071 *et seq.*, Federal Employee Health Benefits Program, 5 U.S.C. §§ 8901, *et seq.* (hereinafter collectively referred to as "Federal Healthcare Programs"), for medication that was never administered to patients.

3.      Not only did Plaintiff's supervisors condone and instruct Piedmont's improper pharmacy billing practices, they also ignored Plaintiff's complaints. Defendant Piedmont's executives and officers recklessly ignored Plaintiff's numerous complaints of the improper practices and then ultimately terminated Plaintiff in retaliation for her complaints.

## JURISDICTION AND VENUE

4.      This action arises under the False Claims Act, as amended, 31 U.S.C.§§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction under the federal False Claims Act,

31 U.S.C. § 3732, including state law claims under 31 U.S.C. § 3732(b). This court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue lies in this district under 28 U.S.C. § 1391(b) & (c) and 31 U.S.C. § 3732(a) because the Defendants transact business and have committed acts in violation of 31 U.S.C. § 3729 in this district.

## THE PARTIES

6.      Plaintiff Lisa Cervalli ("Cervalli") is an adult citizen and resident of the State of Georgia.  Cervalli is a Certified Pharmacy Technician ("CPhT"). She has over 16 years of experience as a CPhT, 12 of which she was a Lead Technician.  Ms. Cervalli is licensed by the State of Georgia and nationally certified.  She attended Clayton State University where she received her pharmacy technician certificate. Plaintiff worked at Piedmont Henry Hospital in Henry County, Georgia from August 3, 2015 to July 2, 2017.  Her employment was terminated after she made complaints to her supervisors, Piedmont's Human Resources department, Piedmont's Compliance department, and Piedmont's officers and executives concerning the improper practices alleged herein.  Since the time of her termination, Ms. Cervalli has been unable to find new employment in her field.

3

7.      Defendant Piedmont Healthcare, Inc. ("Piedmont Healthcare") is a not-for-profit, health care organization serving nearly 2 million patients across Georgia. Piedmont has eleven hospitals and over 800 service locations.  As of June 30, 2016, Piedmont Healthcare had revenues of approximately $2 billion, of which 32% came from services provided under Medicare and 4% came from services provided under Medicaid.  In 2016, Piedmont Healthcare performed tens of thousands of procedures for which it received payment through Medicare and Medicaid.

8.      In 2006, Piedmont Healthcare agreed to pay $3 million to settle a qui tam lawsuit that alleged the hospital submitted claims to federal healthcare programs for services that were not eligible for reimbursement and failed to properly execute contractual agreements with the physicians performing professional services. Piedmont Healthcare signed a Corporate Integrity Agreement that required Piedmont to adhere to certain policies and procedures to ensure compliance with certain statutes and regulations that govern the use of health-care funds.

9.      On June 25, 2020, the U.S. Department of Justice announced that Piedmont Healthcare had agreed to pay $16 million to settle a qui tam lawsuit that claimed Piedmont overbilled Medicare and Medicaid for cardiac care and illegally paid kickbacks to practitioners who referred heart patients to its hospitals. The lawsuit alleged that Piedmont retaliated against a compliance officer who advocated

for Piedmont to take corrective action to address systemic operational and compliance deficiencies.

10.   Piedmont Healthcare's hospitals have pharmacies in-house through which it provides pharmaceuticals and other pharmaceutical supplies to patients at the hospital.

11.   Defendant Piedmont Henry Hospital, Inc. ("Piedmont Henry") is a 230-bed, not-for-profit hospital located in Stockbridge, Georgia with more than 1,500 employees and 450 physicians on staff.   Piedmont Henry joined Piedmont Healthcare in 2012 and primarily serves residents of Henry County.  Specializing in emergency services, Piedmont Henry treated over 75,000 patients in its emergency department last year. A member of Piedmont Healthcare's South Region, Piedmont Henry also offers heart and stroke care, 24-hour medical and surgical services, rehabilitation and women's services. In 2016, Piedmont Henry had 84,039 emergency room visits, 57,872 outpatient encounters and 13,084 inpatient admissions.  Upon information and belief, over 33% of Piedmont Henry patients are covered by Medicare/Medicaid.

## STATUTORY AND REGULATORY FRAMEWORK

### I. The Federal False Claims Act

12.    The False Claims Act ("FCA") provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim to the Government is liable for damages in the amount of three (3) times the amount of loss the Government sustained and penalties which range between $5,500 and $11,000 per claim. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3. For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* at § (b). "[N]o proof of specific intent to defraud is required" for a successful claim under the FCA. *Id.*

13.    The FCA protects employees from retaliation for engaging in acts to stop an employer from submitting false claims, providing the following relief: "reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." 31 U.S.C. § 3729(h).

6

## II.    Healthcare Programs

14.    A healthcare provider commits a violation of the FCA when it presents, or causes to be presented, a false or fraudulent claim for payment under any of the following government healthcare programs.

### A. Medicare

15.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq. establishes the Health Insurance for the Aged and Disabled Program, more popularly known as the Medicare program. Medicare is a federally funded and administered health care program for certain groups of persons, primarily the elderly and the disabled.  It is administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"), a department of HHS.

16.    Medicare Part B, 42 U.S.C. §§ 1395j *et seq.*, covers drugs that usually are not self-administered. In a hospital outpatient department, coverage generally is limited to drugs that are given by infusion or injection. If the injection usually is self-administered or isn't given as part of a doctor's service, Part B generally won't cover it, but a person's Medicare drug plan (Part D) may cover these drugs under certain circumstances.

17.     The Medicare Modernization Act of 2003 (MMA), Pub. L. 108-173, 117 Stat. 2066, established a voluntary prescription drug benefit program for Medicare beneficiaries – Part D– that took effect on January 1, 2006. 42 U.S.C. § 1395w-101 *et se*q.

**B. Medicaid**

18.     Medicaid is a joint federal-state program that provides health care benefits for certain groups; primarily the poor and disabled. Each state administers its own Medicaid program, under federal regulations that generally govern what services should be provided, under what conditions. CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards. The federal government provides a portion of each state's Medicaid funding.  The portion provided is known as the Federal Medical Assistance Percentage ("FMAP") and is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). In Georgia, the rate in effect for 2016 was 67.7 %.

19.     The Children's Health Insurance Program ("CHIP") provides health coverage to eligible children, through both Medicaid and separate CHIP programs. CHIP is administered by states, according to federal requirements. The program is funded jointly by states and the federal government.

**C. TRICARE/CHAMPUS**

20.     In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel.  *Id.*

21.     In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. See 32 C.F.R. §§ 199.4, 199.17(a).  Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE." The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. §199.17(a)(1). The TRICARE Management Activity ("TMA") oversees this program.

**D. Federal Employee Health Benefits Program**

22.     The Federal Employee Health Benefits Program ("FEHBP") is a federally funded medical insurance program for federal employees, retirees, their spouses and unmarried dependent children under age 22, administered by the Office

of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, et seq. Through the OPM, the Government contracts with private health plans or "carriers" to deliver health benefits to its employees. Monies for the FEHBP are maintained in the Employees' Health Benefits Fund ("Health Fund"), and are administered by OPM. 5 U.S.C. § 8909. Federal agencies and their employees contribute to the Health Fund to cover the total cost of health care premiums. 5 U.S.C. § 8906. The monies from the Health Fund are used to reimburse the carriers for claims they pay on behalf of FEHBP beneficiaries.

23.    Defendant Piedmont bills the government for drugs provided under Medicare Parts B and D, TRICARE, Medicaid and FEHBP.

**PIEDMONT'S IMPROPER PHARMACY BILLING PRACTICES**

24.    During Plaintiff's employment, Piedmont Henry used a medical billing software program called EPIC.  EPIC is an integrated suite of software applications that support healthcare organizations including Piedmont.  EPIC's applications support functions related to patient care, including registration and scheduling; clinical systems for doctors, nurses, emergency personnel, and other care providers; systems for lab technologists, pharmacists, and radiologists; and billing systems for insurers. EPIC is a fully integrated system.  EPIC encompasses not only clinical information, but also registration, patient scheduling and billing.

25.    For the pharmacy, Piedmont Henry had an additional module called EPIC Willow that is integrated into the larger EPIC system used by Piedmont Henry. EPIC Willow was the only software used in the pharmacy at Piedmont Henry to track and bill for medications from the time Plaintiff worked at Piedmont Henry.

26.    The EPIC Willow software had systemic problems that are known to the executives and officers of Piedmont.   Other pharmacy tracking and billing software bill patient's accounts upon ***administration*** of the medication dose to the patient.   The EPIC Willow software automatically bills patient's accounts upon the pharmacy ***dispensing*** a medication dose.   Accordingly, if a medication is dispensed but not administered, the patient's account is billed for the medication unless the patient's account is manually credited for the unadministered medication. Medication doses are often dispensed by the Piedmont Henry pharmacy, sent to the requesting department/floor/nurse, but then not administered to the patient for various reasons and eventually returned to the pharmacy.

27.    Unadministered medications piled up in the "med room" by the nursing staff in the various hospital departments.   The med rooms were a mess, with unused meds spilling out from bins, and carts onto the floor of the room.   The nursing staff did not credit back the unused medication doses and the pharmacy was not notified that the medication doses had not been administered.

11

28.     Nurses often could not find the medications that had been ordered for patients and would make subsequent orders for the same medication dose without crediting back the unadministered medication dose or advising the pharmacy that the medication was not administered.  Often, this results in two to three orders for the same medication dose, when the patient may have only received one medication dose. This results in double or triple billing for the same medication dose.

29.     Unused medications would get thrown out or get returned to the pharmacy months later.  When medications are returned to the pharmacy, pills may either get put back on the shelf or may get thrown out if they are out-of-date.  IVs are thrown out and cannot be put back on the shelf.  Only in rare situations are the unused medications manually credited back to patient's accounts.

30.     The Piedmont Henry ER medication situation was especially problematic. Piedmont Henry is the busiest ER in the Piedmont system; it is as busy as the Grady ER in downtown Atlanta.

31.     There are three methods of delivery of medications from the pharmacy to the ER, depending on the urgency of the medication.

32.     First, the ER has a Pyxis machine, which contains regularly used medication that nurses can access and log into the Pyxis machine when a drug is

being removed for a particular patient. At the time a drug is removed from the Pyxis machine and logged by the nurse, the patient's account is charged for the drug.

33.     Second, medications not in the Pyxis machine and that are not urgent are supposed to be dispensed and delivered to the ER by pharmacy techs. Medications are to be either handed to the nurse or placed in the "in" bin in the ER.

34.     Third, Piedmont Henry also has a tube system to deliver "stat" ordered medications to the ER. However, the stat tubes are often used to deliver non-stat medications to the ER. All pharmacy orders for the entire hospital come to a single pharmacy tech assigned to the pharmacy counter during each shift. The tech assigned to the counter has to ensure dispensing of orders for the entire hospital that come out of the printer at the front counter, as well as answer the phone. Pharmacy techs do not always have the time to walk medications down to the ER and, instead, send them in the stat tubes even when the medications are not stat.

35.     Medications delivered via the tube system should be removed from the tube in the ER and placed in the "in" bin. However, given how busy Piedmont Henry's ER is, the medications are often removed and placed on a counter somewhere in the ER such that the nurses are unable to locate the medications. ER nurses do not have time to search for the medications, and, therefore, call the pharmacy asking for

the medication again, resulting in the same medication being dispensed multiple times.

36.     When a pharmacy tech receives a repeat order for a medication that has already been dispensed, the proper procedure would be to "hold" the charge for the redispensed medication. However, pharmacists tell techs to just dispense it and get it into the tube. The charge is almost never held when medications are redispensed to the ER, resulting in multiple charges for the same medication.

37.     It is also the case in the ER that dispensed medications are often not administered to patients because, prior to the medication being administered, the patients are discharged from the ER, transferred to other departments in the hospital, or pass away.

38.     During several exchanges between Plaintiff and her supervisor, Chris Bridgers, Plaintiff was expressly told that she should not manually credit back any unadministered medications that were returned to the pharmacy after 3 days of being dispensed.   She was told that Piedmont would automatically credit the patient's account three days after the medication was dispensed if it was not administered (the "Three Day Rule").   On at least five separate occasions, Plaintiff was told by Bridgers directly of the Three-Day Rule.   Plaintiff was told that these were direct orders from Piedmont Healthcare management.

39.     Plaintiff was told by a colleague that "upper management" was pressuring Bridgers to implement the Three-Day Rule because Piedmont's finance department did not want to have to fix bills that had already been issued to patients' accounts.

40.     Bridgers directed another pharmacy technician, Sherry Greer, to instruct Plaintiff about the Three-Day Rule.  Moreover, Celeste Fowler, another of Plaintiff's supervisors, was present on several occasions when Bridgers would instruct the pharmacy employees during their daily "huddle" about the Three-Day Rule.

41.     Plaintiff knew these medications were not, in fact, being automatically credited after three days, because the EPIC system required manual crediting and, when Plaintiff went to credit returned medications after three days, the system did not indicate that the medications had been credited.

42.     Moreover, there were instances in which months later when unused medications made their way back to the pharmacy, Plaintiff attempted to manually credit back some of the unadministered medications.  In response, Plaintiff was reprimanded by Bridgers for doing so because he told them that Piedmont had already billed the unadministered medications and management did not want to fix billing records that were already submitted for payment – and in some instances, already

paid. Plaintiff was again told that she was not to credit back medications after three days.

43.     Plaintiff asked the lead pharmacy tech about crediting returned medications and was told that Bridges "flips out" if returned medications are credited because the "higher ups" called Bridges irritated that they would have to reissue bills.

## PLAINTIFF REPEATEDLY REPORTED CONCERNS AND WAS RETALIATED AGAINST

44.     During Plaintiff's employment at Piedmont, Plaintiff notified her direct supervisors at Piedmont Henry, Piedmont's Human Resources department, Piedmont's Compliance department, and officers and executives of Piedmont of the issues regarding improper billing for unadministered medications.

45.     In the fall of 2015, shortly after starting at Piedmont, Plaintiff offered to her supervisors, Conrad Robinson, the Pharmacy Operations Manager, and Celeste Fowler, the Director of Pharmacy, to work on crediting the large amount of returned medications sitting in the pharmacy. Mr. Robinson responded that her co-workers may be offended if she did so, because it would imply that they were not doing their job.

46.     During the first half of 2016, Plaintiff reported to multiple HR personnel within Piedmont her concerns that the pharmacy was engaging in improper billing practices.

16

47.     In January 2016, Plaintiff went to Piedmont Henry's Interim CEO, Fred Wilms, and expressed concerns regarding the pharmacy. Mr. Wilms told Plaintiff to contact the head of Human Resources at Piedmont Henry Jana Warren with her concerns.

48.     Plaintiff informed Ms. Warren of her concerns and Ms. Warren responded that she would investigate the concerns.  Upon information and belief, Ms. Warren informed Ms. Fowler, Plaintiff's supervisor, of Plaintiff's complaints about the pharmacy practices.   After Plaintiff voiced her complaints to Ms. Warren, Plaintiff was repeatedly threatened, yelled at and overloaded with work.   For example, Plaintiff was required to carry dozens of heavy cases of IV fluids yet her coworkers only had to carry 2 or 3.

49.     Prior to reporting her concerns to the Human Resources department, Plaintiff received excellent reviews for her performance.

50.     When Plaintiff did not hear back from Ms. Warren, she called the executive office at Piedmont Henry and asked who was in charge of the pharmacy. She was told Sherry Henderson, Piedmont Henry's CFO was in charge of the pharmacy and Plaintiff made an appointment to speak with Ms. Henderson.

51.     Ms. Henderson expressed concern about what she was told by Plaintiff called a meeting of pharmacy staff in February 2016. At that meeting Ms. Henderson

17

saw the returned medications piled up in the pharmacy. Ms. Henderson told staff "this ends now," but the Director of Pharmacy Celeste Fowler responded that the pharmacy did not have enough staff and staff was not paid enough.

52.    In November 2016, Plaintiff called and left a voicemail for Piedmont Healthcare's Chief Compliance Officer Mark Guza stating that she would like to speak with him regarding issues in the pharmacy at Piedmont Henry. Natalie [last name unknown] from the compliance department contacted Plaintiff and interviewed her regarding her concerns. Plaintiff provided names of individuals in the pharmacy who could substantiate Plaintiff's concerns.  Those individuals were interviewed by the Compliance department.

53.    After Plaintiff was interviewed by the Compliance department, the Piedmont Henry pharmacy underwent an audit. In April 2017, it was announced that the Director of Pharmacy, Celeste Fowler, would be leaving the Piedmont Henry pharmacy and taking a new position within Piedmont Healthcare effective June 2017.

54.    Plaintiff's co-workers blamed Plaintiff for Ms. Fowler's reassignment, retaliated against Plaintiff and treated her with hostility as a result.

55.    Chris Bridgers had taken over Mr. Robinson's position as Pharmacy Operations Manager after Mr. Robinson passed away.  Mr. Bridges had worked with Ms. Fowler at another hospital and was friends with her. After Ms. Fowler was

18

reassigned, Mr. Bridgers also blamed Plaintiff for reporting the issues in the pharmacy to the Compliance and Human Resources departments resulting in Ms. Fowler's reassingment, retaliated against Plaintiff, and treated her with hostility.

56.     Deborah Armstrong become the new CEO of Piedmont Henry to replace Interim CEO Fred Wilms in or about October 2016. When Ms. Armstrong started as CEO she held a townhall meeting with Piedmont Henry staff at which she invited staff to come speak with her.

57.     In June 2017, Plaintiff went to speak with Ms. Armstrong, expressing her concerns about the pharmacy and the retaliation towards Plaintiff as a result of her reporting issues in the pharmacy to the Compliance and Human Resources and Compliance departments. Ms. Armstrong told Plaintiff to speak with Amy Stroup, Director of Employee Relations for Piedmont Healthcare in Atlanta.

58.     Plaintiff spoke by telephone with Ms. Stroup and shared her concerns regarding the pharmacy. Ms. Stroup planned to meet in person with Plaintiff on the following Friday, June 30, 2017. They were unable to finish their discussions that Friday and planned to speak again on Sunday, July 1, 2017 when Plaintiff would be working.

59.     On Sunday, July 2, 2017, after Plaintiff finished delivering medications throughout the hospital, she returned to the pharmacy and was told to report to Human

Resources. When Plaintiff arrived in Human Resources, Ms. Stroup and Ms. Warren were waiting for her together with a security guard. Ms. Stroup informed Plaintiff that the problems Plaintiff was having in the pharmacy were not going to get resolved, and, therefore, Piedmont had decided to terminate Plaintiff.

60.     In response to her reporting concerns regarding the pharmacy's billing practices to Human Resources and Compliance, Plaintiff was repeatedly harassed and subjected to hostility by her supervisors Celeste Fowler and Chris Bridgers, as well as her co-workers.  When she complained to Human Resources regarding the retaliation and hostile treatment she was experiencing due to her reporting the pharmacy to Human Resources and Compliance, Human Resources personnel told Plaintiff to just resign if she didn't like what was going on in the pharmacy.  Instead of protecting Plaintiff from retaliation, Defendants ultimately terminated her.

## CLAIMS FOR RELIEF

### COUNT I
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3730(h)
### (Wrongful and Retaliatory Termination)

61.     Plaintiff realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

62.     The False Claims Act entitles employees "all relief necessary to make that employee … whole" if she is terminated "or in any other manner discriminated

20

against in the terms and condition of employment because of lawful acts done by the employee … to stop one or more violations of the FCA."  31 U.S.C. § 3730(h)(1).

63.    An employee so wronged may also be reinstated with equal status and may recover double back pay with interest "and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." *Id.* § 3730(h)(2).

64.    Plaintiff engaged in protected activity by *inter alia*, specifically reporting Defendants' fraudulent activities to her supervisors Conrad Robinson, Celeste Fowler, and Chris Bridgers, as well as to Piedmont's Human Resources department, Chief Compliance Officer, and Piedmont's officers and executives in an attempt to stop the violations described above.

65.    After Plaintiff began reporting her concerns about the billing fraud, Defendants subjected Plaintiff to a hostile work environment due to her protected activity; this discrimination included but was not limited to disparate work conditions not imposed upon employees who acquiesced in Defendant's improper billing practices, harassment, increased discipline and reports thereof, and threats by Mr. Bridges to Plaintiff's employment.

66.    Moreover, Defendant discharged Plaintiff after complaining to the Human Resources and Compliance departments of the billing fraud, and at the time

of termination, informed Plaintiff that the reason for her discharge was that the problems Plaintiff was having in the pharmacy were never going to be resolved.

67.    Because of Defendant's unlawful retaliation against her, Plaintiff has suffered a loss of employment opportunities and earnings and a loss of future earnings and earning capacity, and Plaintiff has suffered and continues to suffer non-monetary damages including but not limited to emotional and physical distress, humiliation, embarrassment, loss of esteem and loss of enjoyment of life.

## COUNT II
## GEORGIA FALSE MEDICAID CLAIMS ACT
## GA. CODE ANN. §49-4-168.4
## (Wrongful and Retaliatory Termination)

68.    Plaintiff realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

69.    By virtue of the acts described above, Plaintiff was discharged, demoted, suspended, threatened, harassed, discriminated against in the terms and conditions of employment by Defendants because of lawful acts done by the employee, on behalf of the employee or others, in retaliation for her complaints about the violations described herein.

70.    Pursuant to O.C.G.A.  § 49-4-168.4, Plaintiff is entitled to all relief necessary to make her whole.  Such relief shall include reinstatement with the same seniority status she would have had but for the discrimination, two times the amount

of back pay, interest on the back-pay award, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands that judgment be entered in her favor against the Defendants as follows:

A.     On Count I, judgment against the Defendant for the maximum amount of damages allowed pursuant to 31 U.S.C. § 3730(h);

B.     On Count II, judgment against the Defendants for the maximum amount of damages allowed pursuant to O.C.G.A.  § 49-4-168.4;

C.     Reasonable attorney's fees and expenses as permitted by applicable statutes and law, including, but not limited to, 31 U.S.C. § 3730(h)(2) and O.C.G.A. § 49-4-168.4;

D.     Pre- and post-judgment interest as allowed by law; and

E.     Any other relief the Court deems just.

## PRAYER FOR A JURY TRIAL

Plaintiff prays a jury trial in this action.

Respectfully submitted,

*s/Kristi Stahnke McGregor*
Kristi Stahnke McGregor

Georgia Bar No. 674012
James M. Evangelista
Georgia Bar No. 707807
David J. Worley
Georgia Bar No. 776665
EVANGELISTA WORLEY, LLC
500 Sugar Mill Road
Suite 245A
Atlanta, GA 30350
Tel: (404) 205-8400
Facsimile: (404) 205-8395
kristi@ewlawllc.com
jim@ewlawllc.com
david@ewlawllc.com

Helen Kim Ho
Georgia Bar No. 121781
HKH LAW LLC
3470 McClure Bridge Road, #1791
Duluth, GA 30096-9998
Telephone: 678-310-7196
Fax: 678-868-6908
Email: helen@hkhlawllc.com

*Counsel for Plaintiff Lisa Cervalli*