## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

|  |  |
|---|---|
| LISA CERVALLI,<br><br>    Plaintiff,<br><br>       v.<br><br>PIEDMONT HEALTHCARE, INC. and PIEDMONT HENRY HOSPITAL, INC.,<br><br>    Defendants. | Civil Action No. 1:20-cv-02790-TWT<br><br>JURY TRIAL DEMANDED |

## <u>AMENDED COMPLAINT</u>

Plaintiff Lisa Cervalli, by and through undersigned counsel, brings this retaliation Complaint against Defendants Piedmont Healthcare, Inc. and Piedmont Henry Hospital, Inc. (collectively, "Piedmont" or "the Defendants"). This action is brought by Plaintiff for relief from retaliatory actions under the U.S. False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and the Georgia False Medicaid Claims Act, O.C.G.A. §49-4-168.4.

## INTRODUCTION

1.      This is an action for relief from retaliatory actions by Piedmont against Plaintiff for lawful acts by employee to stop Piedmont from committing violations of the U.S. False Claims Act and Georgia False Medicaid Claims Act.

2.      Plaintiff attempted to stop Defendants from submitting and/or causing the submission of false claims by knowingly submitting reimbursement claims to Medicare and/or failing to refund overpayments, 42 U.S.C. § 1395 *et seq*., Medicaid, 42 U.S.C. § 1396 *et seq.*, TRICARE/CHAMPUS 10 U.S.C. § 1071 *et seq.*, Federal Employee Health Benefits Program, 5 U.S.C. §§ 8901, *et seq.* (hereinafter collectively referred to as "Federal Healthcare Programs"), for medication that was never administered to patients.

3.      Not only did Plaintiff's direct supervisors condone and instruct Piedmont's fraudulent pharmacy billing practices, but they also retaliated against Plaintiff once she formally complained of these practices by creating and fostering a hostile work environment, and through threats, reprimands, intimidation, and harassment.  Defendant Piedmont's executives and officers recklessly ignored Plaintiff's numerous complaints of the fraudulent practices and of the retaliation resulting from her reporting fraud, then ultimately terminated Plaintiff in retaliation for her complaints.

## JURISDICTION AND VENUE

4.      This action arises under the False Claims Act, as amended, 31 U.S.C.§§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction under the federal False Claims Act, 31 U.S.C. § 3732, including state law claims under 31 U.S.C. § 3732(b). This court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue lies in this district under 28 U.S.C. § 1391(b) & (c) and 31 U.S.C. § 3732(a) because the Defendants transact business and have committed acts in violation of 31 U.S.C. § 3729 in this district.

## THE PARTIES

6.      Plaintiff Lisa Cervalli ("Cervalli") is an adult citizen and resident of the State of Georgia.  Cervalli is a Certified Pharmacy Technician ("CPhT"). She has over 16 years of experience as a CPhT, 12 of which she was a Lead Technician.  Ms. Cervalli is licensed by the State of Georgia and nationally certified.  She attended Clayton State University where she received her pharmacy technician certificate. Plaintiff worked at Piedmont Henry Hospital in Henry County, Georgia from August 3, 2015 to July 2, 2017.  Plaintiff was subjected to adverse actions including termination after she reported the fraudulent practices alleged herein to her

3

supervisors, Piedmont's Human Resources department, Piedmont's Compliance department, and Piedmont's officers and executives.    Since the time of her termination, Ms. Cervalli has been unable to find new employment in her field.

7.    Defendant Piedmont Healthcare, Inc. ("Piedmont Healthcare") is a not-for-profit, health care organization serving nearly 2 million patients across Georgia. Piedmont has eleven hospitals and over 800 service locations.  As of June 30, 2016, Piedmont Healthcare had revenues of approximately $2 billion, of which 32% came from services provided under Medicare and 4% came from services provided under Medicaid.  In 2016, Piedmont Healthcare performed tens of thousands of procedures for which it received payment through Medicare and Medicaid.

8.    In 2006, Piedmont Healthcare agreed to pay $3 million to settle a qui tam lawsuit that alleged the hospital submitted claims to federal healthcare programs for services that were not eligible for reimbursement and failed to properly execute contractual agreements with the physicians performing professional services. Piedmont Healthcare signed a Corporate Integrity Agreement that required Piedmont to adhere to certain policies and procedures to ensure compliance with certain statutes and regulations that govern the use of health-care funds.

9.    On June 25, 2020, the U.S. Department of Justice announced that Piedmont Healthcare had agreed to pay $16 million to settle a qui tam lawsuit that

claimed Piedmont overbilled Medicare and Medicaid for cardiac care and illegally paid kickbacks to practitioners who referred heart patients to its hospitals. The lawsuit alleged that Piedmont retaliated against a compliance officer who advocated for Piedmont to take corrective action to address systemic operational and compliance deficiencies.

10.    Piedmont Healthcare's hospitals have pharmacies in-house through which it provides pharmaceuticals and other pharmaceutical supplies to patients at the hospital.

11.    Defendant Piedmont Henry Hospital, Inc. ("Piedmont Henry") is a 230-bed, not-for-profit hospital located in Stockbridge, Georgia with more than 1,500 employees and 450 physicians on staff.    Piedmont Henry joined Piedmont Healthcare in 2012 and primarily serves residents of Henry County.  Specializing in emergency services, Piedmont Henry treats over 75,000 patients in its emergency department a year. A member of Piedmont Healthcare's South Region, Piedmont Henry also offers heart and stroke care, 24-hour medical and surgical services, rehabilitation and women's services. In 2016, Piedmont Henry had 84,039 emergency room visits, 57,872 outpatient encounters and 13,084 inpatient admissions.

12.    According to Piedmont Healthcare's Consolidated Financial Statements and Audit Report for the fiscal years ending June 30, 2015 and June 3, 2016, net patient service revenue from Medicare and Medicaid accounted for approximately a combined 36% of net patient services revenue for the fiscal year ended June 30, 2016 and 38% for the fiscal year ended June 30, 2015.   Upon information and belief, the percentage of revenue from Medicare and Medicaid to Piedmont Henry, and in particular Piedmont Henry's ER, is higher due to the population it serves.

## STATUTORY AND REGULATORY FRAMEWORK

## I.    The Federal False Claims Act

13.    The False Claims Act ("FCA") provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim to the Government is liable for damages in the amount of three (3) times the amount of loss the Government sustained and penalties which range between $5,500 and $11,000 per claim. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3. For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information;

or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* at § (b). "[N]o proof of specific intent to defraud is required" for a successful claim under the FCA. *Id.*

14.     The FCA protects employees from retaliation for engaging in acts to stop an employer from submitting false claims, providing the following relief: "reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." 31 U.S.C. § 3729(h).

15.     Cases filed by whistleblowers, also known as relators, in the name of the government under the so-called *qui tam* provisions of the False Claims Act are required to be filed under seal pursuant to 31 U.S.C. § 3730(a)(2). Accordingly, a defendant would not be aware of the filing of such a case until, and only if, the case is unsealed by order of the Court.

## II.     The 60-day Rule for Return of Overpayments – "Reverse False Claims"

16.     Section 6402(a) of the Patient Protection and Affordable Care Act ("ACA") (P.L. 111-148) established new section 1128J of the Social Security Act, which requires providers and suppliers who submit claims to Federal Healthcare

Programs to report and return "identified" overpayments to CMS within 60-days or face potential liability under the federal False Claims Act (the "60-Day Rule"). These requirements were implemented by CMS in a February 12, 2016 final rule (81 Fed. Reg. 7653). The Final rule set forth in 42 CFR § 401.305 - *Requirements for Reporting and Returning of Overpayments*, provides in relevant part:

> (a) General.
>
> (1) A person that has received an overpayment must report and return the overpayment in the form and manner set forth in this section.
>
> (2) A person has identified an overpayment when the person has, or should have through the exercise of reasonable diligence, determined that the person has received an overpayment and quantified the amount of the overpayment. A person should have determined that the person received an overpayment and quantified the amount of the overpayment if the person fails to exercise reasonable diligence and the person in fact received an overpayment.
>
> (b) Deadline for reporting and returning overpayments.
>
> (1) A person who has received an overpayment must report and return the overpayment by the later of either of the following:
>
> (i) The date which is 60 days after the date on which the overpayment was identified.
>
> (ii) The date any corresponding cost report is due, if applicable.

17.    The 60-Day Rule goes on to explain that "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment specified in paragraph (b) of this section is an obligation for purposes of 31 U.S.C. § 3729" of

the False Claims Act. Such overpayments that are not refunded to the government are known as "reverse false claims."

### III. The Georgia False Medicaid Claims Act

18.     The GAFMCA provides that any person who knowingly makes or causes to be made any false statement or representation of a material fact for use in determining right to a payment from the Georgia Medicaid Program is liable for a civil penalty of between five thousand five hundred dollars ($5,500) and eleven thousand dollars ($11,000) for each violation, plus three (3) times the amount of all payments judicially found to have been fraudulently received from Medicaid, or its fiscal agents because of the act of that person. Ga. Code Ann., § 49-4-168.1. The GAFMCA defines "knowingly" to mean that a person "has actual knowledge of the information or acts in deliberate ignorance or reckless disregard of the truth or falsity of the information." Ga. Code Ann., § 49-4-168.

19.     The GAFMCA also provides protection for employees from retaliation for efforts to stop violations of the GAFMCA. Ga. Code Ann., § 49-4-168.4(b). Relief includes "reinstatement with the same seniority status that such employee, contractor, or agent would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages

sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees." Ga. Code Ann., § 49-4-168.4(b).

## GOVERNMENT HEALTHCARE PROGRAMS

20.     A healthcare provider commits a violation of the FCA when it presents, or causes to be presented, a false or fraudulent claim for payment under any of the following government healthcare programs.

## I.    Medicare

21.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq. establishes the Health Insurance for the Aged and Disabled Program, more popularly known as the Medicare program. Medicare is a federally funded and administered health care program for certain groups of persons, primarily the elderly and the disabled.  It is administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"), a department of HHS.

22.     Medicare Part B, 42 U.S.C. §§ 1395j *et seq.*, covers drugs that usually are not self-administered. In a hospital outpatient department, coverage generally is limited to drugs that are given by infusion or injection. If the injection usually is self-administered or isn't given as part of a doctor's service, Part B generally won't cover

it, but a person's Medicare drug plan (Part D) may cover these drugs under certain circumstances.

23.    The Medicare Modernization Act of 2003 (MMA), Pub. L. 108-173, 117 Stat. 2066, established a voluntary prescription drug benefit program for Medicare beneficiaries – Part D– that took effect on January 1, 2006. 42 U.S.C. § 1395w-101 *et se*q.

## II.    Medicaid

24.    Medicaid is a joint federal-state program that provides health care benefits for certain groups; primarily the poor and disabled. Each state administers its own Medicaid program, under federal regulations that generally govern what services should be provided, under what conditions. CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards. The federal government provides a portion of each state's Medicaid funding.  The portion provided is known as the Federal Medical Assistance Percentage ("FMAP") and is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). In Georgia, the rate in effect for 2016 was 67.7 %.

25.    The Children's Health Insurance Program ("CHIP") provides health coverage to eligible children, through both Medicaid and separate CHIP programs.

CHIP is administered by states, according to federal requirements. The program is funded jointly by states and the federal government.

### III.  TRICARE/CHAMPUS

26.    In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel.  *Id.*

27.    In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. See 32 C.F.R. §§ 199.4, 199.17(a).  Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE." The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. §199.17(a)(1). The TRICARE Management Activity ("TMA") oversees this program.

IV.  **Federal Employee Health Benefits Program**

28.    The Federal Employee Health Benefits Program ("FEHBP") is a federally funded medical insurance program for federal employees, retirees, their spouses and unmarried dependent children under age 22, administered by the Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, et seq. Through the OPM, the Government contracts with private health plans or "carriers" to deliver health benefits to its employees. Monies for the FEHBP are maintained in the Employees' Health Benefits Fund ("Health Fund"), and are administered by OPM. 5 U.S.C. § 8909. Federal agencies and their employees contribute to the Health Fund to cover the total cost of health care premiums. 5 U.S.C. § 8906. The monies from the Health Fund are used to reimburse the carriers for claims they pay on behalf of FEHBP beneficiaries.

29.    Defendant Piedmont bills the government for drugs provided under Medicare Parts B and D, TRICARE, Medicaid and FEHBP.

**PIEDMONT'S FRAUDULENT
PHARMACY BILLING PRACTICES**

30.    During Plaintiff's employment, Piedmont Henry used a medical billing software program called EPIC.  EPIC is an integrated suite of software applications that support healthcare organizations including Piedmont.  EPIC's applications support functions related to patient care, including registration and scheduling;

13

clinical systems for doctors, nurses, emergency personnel, and other care providers; systems for lab technologists, pharmacists, and radiologists; ***and billing systems for insurers***.  EPIC is a fully integrated system.  EPIC encompasses not only clinical information, but also registration, patient scheduling and billing.

31.    For the pharmacy, Piedmont Henry had an additional module called EPIC Willow that is integrated into the larger EPIC system used by Piedmont Henry. EPIC Willow was the only software used in the pharmacy at Piedmont Henry to track and bill for medications from the time Plaintiff worked at Piedmont Henry.

32.    The EPIC Willow software had systemic problems that are known to the executives and officers of Piedmont.  Other pharmacy tracking and billing software bill patient's accounts upon ***administration*** of the medication dose to the patient.  The EPIC Willow software automatically bills patient's accounts upon the pharmacy ***dispensing*** a medication dose.  Accordingly, if a medication is dispensed but not administered, the patient's account is billed for the medication unless the patient's account is manually credited for the unadministered medication. Medication doses are often dispensed by the Piedmont Henry pharmacy, sent to the requesting department/floor/nurse, but then not administered to the patient for various reasons and eventually returned to the pharmacy.

33.    Unadministered medications piled up in the "med room" by the nursing staff in the various hospital departments.  The med rooms were a mess, with unused meds spilling out from bins, and carts onto the floor of the room.  The nursing staff did not credit back the unused medication doses and the pharmacy was not notified that the medication doses had not been administered.

34.    Nurses often could not find the medications that had been ordered for patients and would make subsequent orders for the same medication dose without crediting back the unadministered medication dose or advising the pharmacy that the medication was not administered.  Often, this results in two to three orders for the same medication dose, when the patient may have only received one medication dose.  This results in double or triple billing for the same medication dose.

35.    The Piedmont Henry ER medication situation was especially problematic.  Piedmont Henry is the busiest ER in the Piedmont system; it is as busy as the Grady ER in downtown Atlanta. Like Grady, many of Piedmont Henry ER's patients are lower income and covered by government health insurance programs.

36.    There are three methods of delivery of medications from the pharmacy to the ER, depending on the urgency of the medication.

37.    First, the ER has a Pyxis machine, which contains regularly used medication that nurses can access and log into the Pyxis machine when a drug is

being removed for a particular patient. At the time a drug is removed from the Pyxis machine and logged by the nurse, the patient's account is charged for the drug.

38.    Second, medications not in the Pyxis machine and that are not urgent are supposed to be dispensed and delivered to the ER by pharmacy techs. Medications are to be either handed to the nurse or placed in the "in" bin in the ER.

39.    Third, Piedmont Henry also has a tube system to deliver "stat" ordered medications to the ER. However, the stat tubes are often used to deliver non-stat medications to the ER. All pharmacy orders for the entire hospital come to a single pharmacy tech assigned to the pharmacy counter during each shift. The tech assigned to the counter has to ensure dispensing of orders for the entire hospital that come out of the printer at the front counter, as well as answer the phone. Pharmacy techs do not always have the time to walk medications down to the ER and, instead, send them in the stat tubes even when the medications are not stat.

40.    Medications delivered via the tube system should be removed from the tube in the ER and placed in the "in" bin. However, given how busy Piedmont Henry's ER is, the medications are often removed and placed on a counter somewhere in the ER such that the nurses are unable to locate the medications. ER nurses do not have time to search for the medications, and, therefore, call the

pharmacy asking for the medication again, resulting in the same medication being dispensed multiple times.

41.    When a pharmacy tech receives a repeat order for a medication that has already been dispensed, the proper procedure would be to "hold" the charge for the redispensed medication. However, pharmacists tell techs to just dispense it and get it into the tube. The charge is almost never held when medications are redispensed to the ER, resulting in multiple charges for the same medication.

42.    It is also the case in the ER that dispensed medications are often not administered to patients because, prior to the medication being administered, the patients are discharged from the ER, transferred to other departments in the hospital, or pass away.

43.    Unused medications would get thrown out or get returned to the pharmacy, sometimes months later.   When medications are returned to the pharmacy, the Pharmacy Department is responsible for "breaking down" the medications, which includes unlabeling medications, putting pills back on the shelf or disposing of medications that are out-of-date.  IVs are thrown out and cannot be put back on the shelf.

44.    Once medication is returned, the Pharmacy Department is also responsible for manually crediting unadministered medication to patients' accounts

in EPIC.  The Pharmacy technicians would pull up each medication's label or code in EPIC which would show to which patient the medications had been dispensed, and then manually credit the unadministered (or multiple doses of unadministered) medication into that patient's account.  In EPIC a technician could see if a particular dispensed medication had been billed and/ or credited.  There is no automatic crediting function for medication in EPIC / EPIC Willow.  This task must be performed manually.

45.    Soon after she began work at Piedmont Henry, Plaintiff noticed the extreme backlog of returned medications that had not been broken down, checked or credited back into EPIC.  Plaintiff noticed through her work in EPIC that it was rare that unused medications were manually credited back to patient's accounts.

46.    Plaintiff was aware and believed, from her previous years of experience working in Henry County, that a large number of patients at Piedmont Henry were low-income and/or government insured (whether by Medicare, Medicaid, CHAMPUS, etc.).  A patient's age is also visible in EPIC, which determines Medicare coverage.

47.    In the fall of 2015, shortly after starting at Piedmont, Plaintiff offered to her supervisors, Conrad Robinson, the Pharmacy Operations Manager, and Celeste Fowler, the Director of Pharmacy, to work on crediting the large amount of

returned medications sitting in the pharmacy. Ms. Fowler responded only by directing Plaintiff to speak with Mr. Robinson. Mr. Robinson turned down Plaintiff's offer, responding that "it was being handled" by other techs and that her co-workers may be offended if she did so because it would imply that they were not doing their job. However, it became apparent to Plaintiff that the majority of the medications returned to the pharmacy were never getting credited back to patients' accounts. The problem became so bad that pharmacy staff jokingly referred to the piles of returned medications that had not been credited to patient accounts as "Mount Returnmore."

### Plaintiff Repeatedly Reported Fraud
### And Was Retaliated Against

48.    During the first half of 2016, when it was clear to Plaintiff that her supervisors were not addressing or correcting the billing of unadministered medications, Plaintiff reported to multiple HR personnel within Piedmont her concerns that the pharmacy was engaging in fraudulent billing practices.

49.    In January 2016, Plaintiff went to Piedmont Henry's Interim CEO, Fred Wilms, and expressed her concerns that pharmacy was not in compliance because patients and insurers were being charged for medications that had not been administered. Mr. Wilms told Plaintiff to contact the head of Human Resources at Piedmont Henry, Jana Warren, with her concerns.

50.    When Plaintiff spoke with Ms. Warren in HR, she stated she believed Piedmont was engaging in insurance fraud.  Ms. Warren responded that she would investigate the concerns and get back to Plaintiff.  Plaintiff did not hear back from Ms. Warren.

51.    Upon information and belief, Ms. Warren informed Ms. Fowler, Plaintiff's supervisor, of Plaintiff's complaints.   After Plaintiff voiced her complaints to Ms. Warren, Plaintiff began being harassed, yelled at, disparately treated, physically hit, and threatened repeatedly at work until her termination.  For example, the day after Plaintiff spoke with Ms. Warren, Ms. Fowler had a conversation with Brenda, a pharmacy staff, in front of Plaintiff saying "she's got a big mouth and went to HR" and repeated some of the same words Plaintiff used in her conversation with Ms. Warren.

52.    Plaintiff was threatened on numerous occasions with physical violence by certain coworkers for reporting to HR and later, Compliance.  Plaintiff reported these threats to her supervisors and/or HR but, on information and belief, no corrective action was taken by Piedmont.  For example, after Plaintiff's first report to HR, a pharmacy tech who had been assigned to work on the medication backlog threatened to "kick [Plaintiff's] ass" twice for complaining to HR.  When Plaintiff reported those threats to Ms. Fowler, Ms. Fowler replied "you must have

misunderstood her." On another occasion, Plaintiff reported another coworker's threat of physical harm to Stacey Bright, Employee Relations Manager, and Ms. Warren, Piedmont Henry HR, and told them, "I'm a whistleblower, you have to protect me," yet HR failed to take any corrective action.

53.     Plaintiff was also overloaded with work after reporting her suspicion of fraud with HR.  For example, Plaintiff was required to carry dozens of heavy cases of IV fluids while her coworkers only had to carry 2 or 3.  Plaintiff would also have extra work left for her to do whenever she was assigned to work the front counter. Plaintiff was made to deliver medications to the entire hospital by herself, versus sharing those duties with another pharmacy technician which was standard. Plaintiff complained about the overloading of work to her supervisors, Ms. Fowler and Chris Bridgers (who replaced Mr. Robinson), and told them she felt she was being punished for reporting her concerns to HR.

54.     Different from her coworkers, Plaintiff's work schedule would get changed at the last minute and she would then be threatened with termination if she did not come in.  On at least one occasion, Plaintiff contacted Stacey at Piedmont Henry HR to report Ms. Fowler's unfair scheduling, her threats of termination for "no show" and violations of notice and turnaround policies. Stacey later called Plaintiff and claimed the scheduling was "a little mistake."

### *Management Establishes "Three-Day Rule"*
### *To Avoid Refunding Overpayments*

55.    In February 2016, after Plaintiff did not hear back from Ms. Warren to whom she first reported fraud, she called the executive office at Piedmont Henry and asked who was in charge of the pharmacy.  She was told Sherry Henderson, Piedmont Henry's CFO was in charge of the pharmacy and Plaintiff made an appointment to speak with Ms. Henderson.  Plaintiff expressed her suspicions that pharmacy was committing insurance fraud by billing patients for unadministered medications and not manually crediting the patients' bills.

56.    Ms. Henderson expressed serious concern about what she was told by Plaintiff and called a meeting of pharmacy staff in February 2016. At that meeting Ms. Henderson saw the returned medications piled up in the pharmacy. Ms. Henderson told staff "this ends now," but the Director of Pharmacy Celeste Fowler responded that the pharmacy did not have enough staff and staff was not paid enough.

57.    After the meeting with Ms. Henderson, in or around May 2016, Chris Bridgers, Pharmacy Operations Manager, introduced a "Three-Day Rule" with pharmacy staff.  During several pharmacy department "huddles" and also in individual exchanges between Plaintiff and Mr. Bridgers, Plaintiff was expressly told that she should not manually credit back any unadministered medications that

were returned to the pharmacy after 3 days of being dispensed.  She was told that EPIC would "automatically credit" the patient's account three days after the medication was dispensed if it was not administered (the "Three-Day Rule").  On at least five separate occasions, Plaintiff was told by Bridgers directly of the Three-Day Rule.  Plaintiff was told that these were direct orders from Piedmont Healthcare management.

58.    When the Three-Day Rule was discussed by Mr. Bridgers, Plaintiff asked when this policy was put in place – Mr. Bridgers responded it "had always been this way."  Plaintiff knew that EPIC could not automatically credit a patient's account, but, rather, that credits had to be performed manually. Plaintiff also asked Mr. Bridgers during one of the huddles, how EPIC would automatically credit patient accounts, but Mr. Bridgers simply cut her off.

59.    Plaintiff was told by a colleague that "upper management" was pressuring Bridgers to implement the Three-Day Rule because Piedmont's finance department did not want to have to fix bills that had already been issued to patients' accounts.

60.    Bridgers directed another pharmacy technician, Sherry Greer, to instruct Plaintiff about the Three-Day Rule.  Moreover, Celeste Fowler was present

on several occasions when Bridgers would instruct the pharmacy employees during their daily "huddle" about the Three-Day Rule.

61.    Plaintiff knew these medications were not, in fact, being automatically credited after three days, because the EPIC system required manual crediting. Despite Mr. Bridger's instructions, Plaintiff continued to check returned, unadministered medications against patient accounts in EPIC, and found that the unadministered medications had not been credited (whether manually or automatically by the system) after three days of being dispensed.

62.    Plaintiff attempted to manually credit back months' old, unadministered medications but was stopped by her supervisors.   On several occasions, Plaintiff was reprimanded by Mr. Bridgers for doing so because he told them that Piedmont had already billed the unadministered medications and management did not want to fix billing records that were already submitted for payment – and in some instances, already paid.  Plaintiff was again told that she was not to credit back medications after three days.

63.    Plaintiff asked the lead pharmacy tech about crediting returned medications and was told that Bridgers "flips out" if returned medications are credited because the "higher ups" called Bridgers irritated that they would have to reissue bills.

64.    The Three-Day Rule was introduced by Piedmont at the same time as the 60-Day Rule went into effect requiring providers to refund overpayments to the government within 60 days of identification. Piedmont was now required to refund overpayments to the government for medications if the pharmacy "identified" the overpayment by crediting the patient's account in EPIC. Preventing the pharmacy from crediting the overpayments gave Piedmont's billing department an (albeit weak) argument that the overpayments had not been "identified" for purposes of the 60-Day Rule.

### *Plaintiff Reports Fraud To Compliance*
### *Department And Retaliation Increases*

65.    In November 2016, when it was clear to Plaintiff that no corrective action was being taken on the fraudulent billing and, rather, management was furthering the fraudulent billing through the Three-Day Rule, Plaintiff called and left a voicemail for Piedmont Healthcare's Chief Compliance Officer Mark Guza stating that she would like to speak with him regarding issues in the pharmacy at Piedmont Henry. Natalie [last name unknown] from the compliance department contacted Plaintiff and interviewed her regarding her concerns.  Plaintiff told Natalie that she believed insurance fraud was running rampant at Piedmont and that nothing was being done about it.  Plaintiff provided names of individuals in the pharmacy who

could substantiate Plaintiff's concerns. Those individuals were interviewed by the Compliance department.

66.    After Plaintiff was interviewed by the Compliance department, the Piedmont Henry pharmacy underwent an audit. After Plaintiff complained to Compliance and the audit began, the retaliation against Plaintiff increased.

67.    In November 2016, Plaintiff was instructed to come into Mr. Bridgers' office towards the end of a work day. Mr. Bridgers yelled at Plaintiff and threatened to fire her if she ever reported to HR again.

68.    In or around March 2017, Ms. Fowler, in front of the entire pharmacy team, yelled at Plaintiff and placed her face within one inch of Plaintiff's face. Plaintiff stepped back and walked away. As she did so, Danishia, an agency technician, deliberately bumped / physically assaulted Plaintiff in front of Ms. Fowler and her coworkers while saying Plaintiff had "disrespected" Ms. Fowler. Danishia hit Plaintiff a second time later that day.

69.    In April 2017, it was announced that the Director of Pharmacy, Celeste Fowler, would be leaving the Piedmont Henry pharmacy and taking a new position within Piedmont Healthcare effective June 2017.

70.    Plaintiff's co-workers and supervisors blamed Plaintiff for Ms. Fowler's reassignment.

71.    Two of Plaintiff's coworkers, Romeo and Niteria said in front of Ms. Fowler while Lisa was present, that "co-workers who tell on people to HR should be taken out to the parking lot of the hospital and beaten badly so they understand not to run their mouth anymore."  They then said the person should be taken instead to the nearby "Publix parking lot," which is where Plaintiff's daughter was currently working.

72.    Mr. Bridgers, Pharmacy Operations Manager, had worked with Ms. Fowler at another hospital and was friends with her. After Ms. Fowler was reassigned, Mr. Bridgers also blamed Plaintiff for reporting the issues in the pharmacy to the Compliance and Human Resources departments resulting in Ms. Fowler's reassignment, and continued to retaliate against her and treat her with hostility.

### Defendants Terminate Plaintiff Because She Refuses To Drop Her Complaints Regarding Billing Fraud

73.    When a few months passed after reporting the pharmacy's fraudulent billing to compliance and still nothing was being done to address the fraudulent billing, Plaintiff grew more frustrated and began exploring the possibility of blowing the whistle to the government by pursuing a *qui tam* lawsuit under the False Claims Act. Plaintiff also began to hear talk amongst her co-workers in the pharmacy about the potential for qui tam lawsuits as a result of the fraudulent billing to the

government for unadministered medications. Plaintiff believes that management was also hearing the talk of *qui tam* lawsuits.

74.    Plaintiff understood that many of the patients seen in the Piedmont Henry ER were Medicaid and Medicare beneficiaries.  Plaintiff had previously worked at another nearby pharmacy where she experienced low income patients covered by Medicaid unable to pay for medications who would instead go to the local ER to obtain medications. Plaintiff believed the same was true for Piedmont Henry ER as she saw many of the same patients she had seen at the prior pharmacy where she had worked show up in the Piedmont Henry ER.

75.    Deborah Armstrong had become the new CEO of Piedmont Henry to replace Interim CEO Fred Wilms in or about October 2016. When Ms. Armstrong started as CEO she held a townhall meeting with Piedmont Henry staff at which she invited staff to come speak with her.

76.    When it became apparent that Piedmont had attempted to sweep Plaintiff's concerns under the rug and enacted a new policy (the Three-Day Rule) to perpetuate fraudulent billing practices, Plaintiff made one last effort to get Piedmont to do the right thing before pursuing blowing the whistle to the government.

77.    In June 2017, Plaintiff spoke with Ms. Armstrong, expressing her belief that pharmacy continued to be out of compliance and was perpetrating insurance

fraud.  Plaintiff also reported the ongoing retaliation towards Plaintiff as a result of her reporting fraud to the Compliance and Human Resources departments. Ms. Armstrong told Plaintiff to speak with Amy Stroup, Director of Employee Relations for Piedmont Healthcare in Atlanta.

78.     Plaintiff spoke by telephone with Ms. Stroup and shared her concerns about pharmacy's fraudulent billing practices and the ongoing retaliation against her. Ms. Stroup planned to meet in person with Plaintiff on the following Friday, June 30, 2017. They were unable to finish their discussions that Friday and planned to speak again on Sunday, July 2, 2017 when Plaintiff would be working.

79.     On Sunday, July 2, 2017, after Plaintiff finished delivering medications throughout the hospital, she returned to the pharmacy and was told to report to Human Resources. When Plaintiff arrived in Human Resources, Ms. Stroup and Ms. Warren were waiting for her together with a security guard. Ms. Stroup informed Plaintiff that "the problems" Plaintiff was having in the pharmacy were "not going to get resolved," and, therefore, Piedmont had decided to terminate Plaintiff. Plaintiff understood this to mean that the fraudulent billing was not going to stop and, since Plaintiff refused to stop complaining about the fraudulent billing, Plaintiff had to be terminated. Plaintiff asked for paperwork but was not given any.

### *Plaintiff Followed The Reporting Process*
### *Outlined In Piedmont's Code Of Conduct*

80.    Plaintiff complied with the reporting process outlined in Piedmont's Code of Conduct, which requires employees to report known or suspected violations of the Code including improper billing and record keeping practices, and which assures employees, who report on compliance issues to the best of their knowledge, they will "not be retaliated against in any manner for making reports."

81.    Plaintiff chose to report her concerns internally to give Piedmont the opportunity to remedy the fraudulent billing practices, when she could have immediately blown the whistle to the government under the *qui tam* provisions of the False Claims Act and sought a relator award.

82.    Plaintiff reported on the retaliatory treatment on approximately 10 separate occasions to Piedmont Henry HR, each time noting that her supervisors' and/or coworkers' threats and hostile actions were because of her reporting on the pharmacy's insurance fraud to HR and Compliance.  HR would either not follow up with Plaintiff after she reported the retaliation or follow up and say they "could not substantiate the claims."  HR personnel also told Plaintiff on several occasions to "just resign" if she didn't like what was going on in pharmacy.  Plaintiff responded that as long she was being retaliated against because she chose to report to HR as she was instructed to do by Piedmont's Code of Conduct, Plaintiff would not stop

reporting. In the end, Plaintiff was terminated for refusing to stop reporting on the pharmacy's insurance fraud.

83.     On information and belief, no investigation, action or discipline was taken against any of Plaintiff's coworkers or supervisors for their adverse actions against Plaintiff.

84.     Prior to reporting her concerns to Piedmont's Human Resources and Compliance departments, Plaintiff received excellent reviews for her performance. Plaintiff received raises.  Plaintiff has no record of any discipline or reprimand prior to her reporting to Compliance and was never subject to graduated discipline. Plaintiff was formally written up one time, for allegedly missing work without permission, 3 days before she was terminated.

## CLAIMS FOR RELIEF

### COUNT I
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3730(h)
### (Wrongful and Retaliatory Termination)

85.     Plaintiff realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

86.     The False Claims Act entitles employees "all relief necessary to make that employee … whole" if she is terminated "or in any other manner discriminated

against in the terms and condition of employment because of lawful acts done by the employee … to stop one or more violations of the FCA." 31 U.S.C. § 3730(h)(1).

87.   An employee so wronged may also be reinstated with equal status and may recover double back pay with interest "and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." *Id.* § 3730(h)(2).

88.   Plaintiff engaged in protected activity by *inter alia*, specifically reporting Defendants' fraudulent activities to her supervisors Conrad Robinson, Celeste Fowler, and Chris Bridgers, as well as to Piedmont's Human Resources department, Chief Compliance Officer, and Piedmont's officers and executives in an attempt to stop the violations described above.

89.   After Plaintiff began reporting her concerns about the billing fraud, Defendants subjected Plaintiff to a hostile work environment because of her protected activity; this discrimination included but was not limited to disparate work conditions not imposed upon employees who acquiesced in Defendant's fradulent billing practices, harassment, threats of physical harm, physical assault, increased discipline and reports thereof, and threats by Mr. Bridgers and Ms. Fowler to Plaintiff's employment.

90.    Defendant discharged Plaintiff after complaining to the new CEO of Piedmont Henry and to Piedmont Healthcare's Human Resources department about the billing fraud and retaliation, and at the time of termination, informed Plaintiff that the reason for her discharge was that the problems Plaintiff was having in the pharmacy were never going to be resolved.

91.    Because of Defendant's unlawful retaliation against her, Plaintiff has suffered a loss of employment opportunities and earnings and a loss of future earnings and earning capacity, and Plaintiff has suffered and continues to suffer non-monetary damages including but not limited to emotional and physical distress, humiliation, embarrassment, loss of esteem and loss of enjoyment of life.

**COUNT II**
**GEORGIA FALSE MEDICAID CLAIMS ACT**
**GA. CODE ANN. §49-4-168.4**
**(Wrongful and Retaliatory Termination)**

92.    Plaintiff realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

93.    By virtue of the acts described above, Plaintiff was discharged, demoted, suspended, threatened, harassed, discriminated against in the terms and conditions of employment by Defendants because of lawful acts done by the employee, on behalf of the employee or others, in retaliation for her complaints about the violations described herein.

94.    Pursuant to O.C.G.A.  § 49-4-168.4, Plaintiff is entitled to all relief necessary to make her whole.  Such relief shall include reinstatement with the same seniority status she would have had but for the discrimination, two times the amount of back pay, interest on the back-pay award, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands that judgment be entered in her favor against the Defendants as follows:

A.    On Count I, judgment against the Defendant for the maximum amount of damages allowed pursuant to 31 U.S.C. § 3730(h);

B.    On Count II, judgment against the Defendants for the maximum amount of damages allowed pursuant to O.C.G.A.  § 49-4-168.4;

C.    Reasonable attorney's fees and expenses as permitted by applicable statutes and law, including, but not limited to, 31 U.S.C. § 3730(h)(2) and O.C.G.A. § 49-4-168.4;

D.    Pre- and post-judgment interest as allowed by law; and

E.    Any other relief the Court deems just.

## PRAYER FOR A JURY TRIAL

Plaintiff prays a jury trial in this action.

Respectfully submitted,

*s/Kristi Stahnke McGregor*
Kristi Stahnke McGregor
Georgia Bar No. 674012
James M. Evangelista
Georgia Bar No.  707807
David J. Worley
Georgia Bar No. 776665
EVANGELISTA WORLEY, LLC
500 Sugar Mill Road
Suite 245A
Atlanta, GA 30350
Tel: (404) 205-8400
Facsimile: (404) 205-8395
kristi@ewlawllc.com
jim@ewlawllc.com
david@ewlawllc.com

Helen Kim Ho
Georgia Bar No. 121781
HKH LAW LLC
3470 McClure Bridge Road, #1791
Duluth, GA 30096-9998
Telephone: 678-310-7196
Fax: 678-868-6908
Email: helen@hkhlawllc.com

*Counsel for Plaintiff Lisa Cervalli*

35

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day I served the above and foregoing AMENDED COMPLAINT on all parties by causing a true and correct copy to be filed with the court's electronic filing system, which should automatically send a copy to all counsel of record.

Dated:  September 15, 2020        *s/ Kristi Stahnke McGregor*
                                  Kristi Stahnke McGregor
                                  Georgia Bar No. 674012

                                  *Counsel for Plaintiff Lisa Cervalli*